The **SERVANTS OF THE PARACLETE, INC.,** Plaintiff,

v.

**GREAT AMERICAN INSURANCE CO., et al.,** Defendants.

**Civ. No. 93–236 JB/DJS.**

United States District Court,
D. New Mexico.

Nov. 7, 1994.

Floyd D. Wilson, Wilson and Pryor, P.C., Albuquerque, NM, for plaintiff.

Jeffrey R. Anderson, Mark ·A. Wendorf, Thomas C. Racette, Reinhardt and Anderson, St. Paul, MN, Bruce E. Pasternack, Albuquerque, NM, for John Does.

Jeffrey J. Bouslog Oppenheimer, Wolff & Donnelly, St. Paul, MN, Robert J. Mroz, Madison, Harbour, Mroz & Puglisi, P.A., Albuquerque, NM, for St. Paul.

Stephen J. Lauer, Grey W. Handy, Michael W. Brennan, Carpenter, Comeau, Maldegen, Brennan, Nixon & Templeman, Santa Fe, NM, for Great American.

David M. Spector, Kira Druyan, Mayer, Brown & Platt, Chicago, IL, Victor Ortega, Montgomery & Andrews, P.A., Albuquerque, NM, for Catholic Mut.

Peter W. Burg, James D. Kilroy, Burg & Eldredge, P.C., Denver, CO, David M. Houliston, Albuquerque, NM, for intervenor U.S. Fire Ins.

Kenneth L. Harrigan, Timothy R. Van Valen, Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, NM, for intervenor Roman Catholic Diocese of Fall River.

Karen C. Kennedy, Simons, Cuddy & Friedman, Albuquerque, NM, for intervenor Roman Catholic Archdiocese of Santa Fe.

### MEMORANDUM OPINION AND ORDER

BURCIAGA, Chief Judge.

THIS MATTER is before the Court on the following motions of the parties: Defendant St. Paul Fire and Marine Insurance Company's ("St. Paul's") motion to strike the affidavit of Linda Soroos dated January 18, 1994; St. Paul's motion to strike the affidavit of Linda Soroos dated May 11, 1994; Defendants John Does' ("Does'") cross-motion for partial summary judgment against St. Paul; Plaintiff The Servants of the Paraclete, Inc.'s ("Plaintiff's," "Servants") motion for consolidation of Civ. No. 93–236 with Civ. No. 94–143 and Civ. No. 94–144; Defendant Great American Insurance Company's ("Great American's") motion for disclosure of settlement amounts; Plaintiff's and the Does' motion for amendment and clarification of judgment against Defendant Catholic Mutual Relief Society ("Catholic Mutual"); Catholic Mutual's motion for partial summary judgment establishing the extent of Catholic Mutual's liability as a result of breaching its duty to defend; Catholic Mutual's motion for partial summary judgment dismissing Plaintiff's extra-contractual claims; Catholic Mutual's motion for entry of partial final judgment pursuant to Rule 54(b); Great American's motion to alter or amend judgment; and, St. Paul's motion to reconsider, clarify and/or amend order denying its motion for summary judgment. The Court, having reviewed the pleadings, the submissions of the parties and the relevant law, and being otherwise fully advised of the premises, finds that most of the parties' motions are not well taken and are denied; however, the Court will grant in part St. Paul's motion to strike the affidavit of Linda Soroos dated May 11, 1994, Plaintiff's and the Does' motion for amendment and clarification of judgment against Catholic Mutual, Great American's motion to alter or amend judgment, and St. Paul's motion to reconsider, clarify and/or amend order denying its motion for summary judgment, as noted below.

### FACTS AND PROCEDURAL HISTORY

This is a declaratory judgment action. Plaintiff alleges that Defendants, insurance companies St. Paul, Catholic Mutual, and Great American, breached their respective contracts to defend and indemnify Plaintiff in numerous lawsuits seeking damages against Plaintiff for alleged sexual abuse that former priest James R. Porter ("Porter") committed. Porter was a priest with the Diocese of Fall River in Massachusetts. In 1967, he was sent to Plaintiff's facilities in Jemez Springs, New Mexico, a retreat for pedophilic priests. During his retreat, Porter was assigned to work as a supply priest in various parishes throughout New Mexico in 1968 and was similarly assigned to a church in Bemidji,

Minnesota in August, 1969. At these locations, Porter allegedly sexually abused numerous parish children.

In 1992, the Does sued Plaintiff in the state courts of New Mexico and Minnesota. Does I–XVI are the plaintiffs in the Minnesota actions and Does I–IV are the New Mexico claimants. Plaintiff made a demand to each of the Defendants insurance companies for defense and indemnification in these lawsuits, but, with the exception of Great American, which agreed to defend only against the New Mexico Does, the insurance companies rejected Plaintiff's demands. In November 1993, Plaintiff settled both the Minnesota and New Mexico actions and as part of the settlement, assigned to the Does its claims against Defendants insurance companies.

On June 14, 1994, this Court decided several motions in the present action. The Court denied St. Paul's motion for summary judgment that it had no duty to defend Plaintiff in the Minnesota actions but granted the summary judgment motion that St. Paul had no duty to defend the New Mexico actions. The Court denied Catholic Mutual's motion for summary judgment that it had no duty to defend Plaintiff in the Does' actions, but granted the summary judgment motion that Catholic Mutual had no duty to indemnify Plaintiff in those actions. Finally, the Court denied Great American's motion for summary judgment that it had no duty to defend or indemnify Plaintiff, and granted Plaintiff's and the Does' cross-motions for partial summary judgment against Great American. *See generally Servants of the Paraclete, Inc. v. Great Am. Ins. Co.,* 857 F.Supp. 822 (D.N.M.1994). Since that time the parties have filed the several motions presently before the Court, which the Court now considers in turn.

## I. ST. PAUL'S MOTION TO STRIKE SO-ROOS AFFIDAVIT OF JANUARY 18, 1994

The Court will deny St. Paul's motion to strike the affidavit of Linda Soroos dated January 18, 1994 ("January Soroos Affidavit"), because the affidavit is admissible under Rule 56(e) of the Federal Rules of Civil Procedure governing affidavits accompanying motions for summary judgment. Fed.R.Civ.P. 56(e). Before reaching the substantive requirements for summary judgment affidavits, the Court briefly notes and rejects Plaintiff's initial argument, that St. Paul's motion to strike is not the proper way to challenge the legal sufficiency of an affidavit. The United States Court of Appeals for the Tenth Circuit has explicitly held that legally insufficient affidavits under Rule 56(e) are subject to a motion to strike. *Noblett v. General Elec. Credit Corp.,* 400 F.2d 442, 445 (10th Cir.1968); *see also Thrasher v. B & B Chemical Co.,* 2 F.3d 995, 998 (10th Cir. 1993); *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988).

Turning to the substantive requirements for summary judgment affidavits, Rule 56(e) specifies that affidavits supporting or opposing a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e). Furthermore, the United States Court of Appeals for the Tenth Circuit has held that "conclusory" summary judgment affidavits are legally insufficient. *See, e.g., Hall v. Bellmon,* 935 F.2d 1106, 1111 (10th Cir.1991). St. Paul has failed to establish that the January Soroos affidavit is deficient in any of these respects.

St. Paul first argues that the Court should strike the January Soroos Affidavit because it is conclusory. The parties do not dispute that if the January Soroos Affidavit is conclusory, the Court may strike it. *See, e.g., Travelers Ins. Co. v. D. & D. Contracting,* 962 F.2d 971, 972 (10th Cir.1992); *Hall,* 935 F.2d at 1111. Rather, the parties dispute whether the January Soroos Affidavit is conclusory. The Court finds that it is not. The operative part of the January Soroos Affidavit states:

I have searched the records of the Servants of the Paraclete, Inc. in an attempt to locate copies of policies or other documentation regarding the Servants' liability insurance coverage during the late 1960's and early 1970's, including any policies or documentation regarding liability insur-

ance coverage which the Servants obtained from St. Paul Fire and Marine Insurance Company. Despite that search, I have not located any policy or other documentation regarding St. Paul's providing liability insurance coverage to the Servants during this period of time.

January Soroos Affidavit ¶ 2. St. Paul alleges that the affidavit is conclusory because it "does not provide any substantive discussion whatsoever of Ms. Soroos' alleged 'search' for the lost policies." St. Paul's Mem. Supp. Mot. Strike [Jan.] Aff. Linda Soroos, at 3 (emphasis omitted). St. Paul appears to mistake "concise" for "conclusory." Concise Ms. Soroos' affidavit certainly is, and the affidavit's brevity must go to its weight. Conclusory, however, it is not. *Webster's Third New International Dictionary* ("*Webster's*") defines "conclusion" as "the drawing of an inference." *Webster's, supra,* at 471. An affidavit is "conclusory," then, when it draws inferences. When Ms. Soroos states, "I have searched the records of the Servants of the Paraclete, Inc.," she is not drawing an inference. Rather, she is briefly stating a physical action that she took.

As St. Paul observes in its Reply, Ms. Soroos does state in her affidavit, "I can only conclude that any policies or documentation which the Servants once had regarding such insurance coverage must have been lost." January Soroos Aff. ¶ 2; St. Paul's Reply Supp. Mot. Strike [Jan.] Aff. Linda Soroos, at 4. At the risk of splitting hairs, however, Ms. Soroos' conclusion does not render her affidavit conclusory. Ms. Soroos does not attest that the policies or other documentation have been lost. Had she done so, she would have attested to a fact based on an inference. Rather, Ms. Soroos attests that *she has concluded* that the policies or other documentation have been lost, that *she believes* they are lost. She attests only to her state of mind, not to a fact based on an inference.

▪ Next, St. Paul argues that the Court should strike the January Soroos Affidavit because Ms. Soroos' deposition testimony directly undermines the affidavit. St. Paul is incorrect for two reasons. First, Ms. Soroos' deposition testimony does not undermine her affidavit. Her *affidavit* indicates that she searched Plaintiff's records and did not locate any policies or documentation relating to St. Paul's coverage of Plaintiff during the late 1960's and early 1970's. In her *deposition* Ms. Soroos states that she "went through [her] file cabinets, file by file, to see if I could find anything," and that the endeavor took her about "half a day." St. Paul cannot seriously contend that the two propositions are inconsistent. Second, even if the affidavit and the deposition were not entirely consistent, the Court could only strike the affidavit if it was in "clear, irreconcilable conflict" with the deposition such that the affidavit was simply "an attempt to create a sham fact issue." *Durtsche v. American Colloid Co.,* 958 F.2d 1007, 1010 n. 2 (10th Cir.1992); *Franks v. Nimmo,* 796 F.2d 1230, 1237 (10th Cir.1986). The January Soroos Affidavit certainly does not constitute an attempt to create a sham factual issue. Therefore, St. Paul has not established the legal insufficiency of the January Soroos Affidavit, and the Court will not strike the affidavit.

## II. ST. PAUL'S MOTION TO STRIKE SOROOS AFFIDAVIT OF MAY 11, 1994

The Court will also deny St. Paul's motion to strike the affidavit of Linda Soroos dated May 11, 1994 ("May Soroos Affidavit"); again, the affidavit satisfies the requirements of Federal Rule of Civil Procedure 56(e). First, St. Paul argues that the May Soroos Affidavit is improper because Plaintiff did not file it in support of any motion. St. Paul's objection is one of form rather than substance. Plaintiff filed the May Soroos Affidavit on May 11, 1994. On the same day, the John Does filed a cross-motion for partial summary judgment against St. Paul. The May Soroos Affidavit factually supports this cross-motion for partial summary judgment. Furthermore, the Does attached the May Soroos Affidavit as Exhibit A to their Reply Memorandum in Support of Cross–Motion for Partial Summary Judgment Against St. Paul Fire and Marine Insurance Company ("Does' Partial Summary Judgment Reply Memorandum"), filed on June 15, 1994. Clearly, then, the May Soroos Affidavit sup-

ports the Does' cross-motion for partial summary judgment against St. Paul, regardless of whether Plaintiff first submitted it "in support of" that motion.

■ St. Paul also objects that the May Soroos Affidavit is untimely if submitted in support of the Does' partial summary judgment motion. However, Plaintiff first filed the affidavit on May 11, 1994, the very same day the Does filed the partial summary judgment motion that the affidavit supports. The Court notes that the Does have violated Local Rule 7.5 by filing their Partial Summary Judgment Reply Memorandum, with the May Soroos Affidavit attached, fourteen business days after service of St. Paul's Memorandum in Opposition to the Does' Cross-motion for Summary Judgment. D.N.M.LR–Cv 7.5. However, the untimeliness of the Does' May Soroos Affidavit is moot because Plaintiff's May Soroos Affidavit was timely. St. Paul further objects that Plaintiff filed the May Soroos Affidavit on May 11, 1994 but did not serve the affidavit on St. Paul until May 20, 1994. St. Paul does not appear to have suffered any prejudice from the delay; it filed its motion to strike the affidavit on May 25, 1994 without asking the Court for any extensions of time. Therefore, the Court will not strike the affidavit on grounds of untimeliness or late service.

■ St. Paul next argues that the Court should strike the May Soroos Affidavit because it is conclusory. First, St. Paul alleges that the May Soroos Affidavit "suffers from virtually the same evidentiary flaws" as the January Soroos Affidavit. St. Paul's Mem. Supp. Mot. Strike Aff. Linda Soroos Dated May 11, 1994, at 2. The Court rejects this argument for the reasons stated in Section I, *supra*. St. Paul then indicates particular portions of the May Soroos Affidavit that it characterizes as "conclusory," asking that the Court strike those portions of the affidavit. However, none of the indicated portions are conclusory. In paragraphs six, seven, and eight of her affidavit, Ms. Soroos states that she examined "all existing" materials in designated locations. *See* Aff. Linda Soroos Dated May 11, 1994, ¶¶ 6–8. St. Paul objects that in each of these paragraphs Ms. Soroos does not state how she knows she searched

all existing materials, what information in the materials she examined, or how long she examined the materials.

Regarding St. Paul's first point, the May Soroos Affidavit indicates how Ms. Soroos would know that she had searched all existing files and minute books. In the affidavit, Ms. Soroos states: "I am employed as Administrator by the Servants of the Paraclete, (the "Servants"), and have been so employed since May 1, 1975. My responsibilities as Administrator, include, among other things, maintaining the Servants' insurance files and records." May Soroos Affidavit ¶¶ 1–2. Furthermore, in her April 11, 1994 deposition ("Soroos Deposition"), Ms. Soroos states that she was the only person who worked in the Servants' office, Dep. Linda Soroos, at 6, line 15, that she would know about any records the Servants kept from 1975 to the present, and that she did not know of anyone who would know about records kept before that date. Dep. Linda Soroos at 74, lines 5–16. Thus, Ms. Soroos would know that she searched all existing files because she keeps those files. St. Paul's second and third arguments, that Ms. Soroos should have attested to what information she examined and how long she examined them, call for peripheral information. Ms. Soroos reaches no improper conclusions when she states that she searched certain identified files but does not state what each file contained or how long it took her.

■ St. Paul's next argument, that the May Soroos Affidavit contains inadmissible hearsay, is also without merit. The May Soroos Affidavit contains no such hearsay. St. Paul objects to paragraphs 3, 4, and 5, in each of which Ms. Soroos attests that she contacted a named person to ask that person if he or she had any information regarding the Servants' liability insurance policies, and that each person "did not have any recollection regarding insurance coverage during the 1969–1971 time frame." May Soroos Aff. ¶¶ 3–5. Neither Ms. Soroos' implied inquiries to these persons, nor their responses to her, are inadmissible hearsay. Federal Rule of Evidence 801(c) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hear-

ing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). A "statement," in turn, Rule 801 defines as "an oral or written assertion." Fed.R.Evid. 801(a). To the extent that paragraphs 3–5 of the May Soroos Affidavit imply that Ms. Soroos asked certain persons if they had any information regarding Plaintiff's insurance policies, these inquiries are not hearsay because, like most inquiries, they are not assertions. *See United States v. Lewis*, 902 F.2d 1176, 1179 (5th Cir.1990) ("While 'assertion' is not defined in the rule, the term has the connotation of a positive declaration.... The questions asked by the unknown caller, like most questions and inquiries, are not hearsay because they do not, and were not intended to, assert anything."); *Bolen v. Paragon Plastics, Inc.*, 754 F.Supp. 221, 225 (D.Mass.1990). In addition, because questions are neither true nor false, Plaintiff and the Does do not offer Ms. Soroos' questions "to prove the truth of the matter asserted." Fed.R.Evid. 801(c); *United States v. Vest*, 842 F.2d 1319, 1330 (1st Cir.), *cert. denied*, 488 U.S. 965, 109 S.Ct. 489, 102 L.Ed.2d 526 (1988); *accord United States v. Shepherd*, 739 F.2d 510, 514 (10th Cir.1984) ("An order or instruction is, by its nature, neither true nor false and thus cannot be offered for its truth.").

■ To the extent that paragraphs 3–5 of the May Soroos Affidavit contain the out-of-court statements of Ms. Maria Monty, Fr. Joe McNamara, and Fr. Michael Foley, that each has no knowledge of the Servants' insurance coverage from 1969 to 1971, these statements are not hearsay because they are not offered for their truth. *See* Fed.R.Evid. 801(c). The parties do not dispute that Plaintiff and the Does offer both Soroos Affidavits in order to show that Plaintiff made a good faith, diligent, but unsuccessful search for Plaintiff's alleged insurance policies from 1969 to 1971, including an alleged policy that St. Paul issued. The out-of-court statements of Ms. Monty, Fr. Joe McNamara, and Fr. Michael Foley are offered merely to show a part of Ms. Soroos' diligent but unsuccessful search. *See* C. Wright & A. Miller, Fed. Prac. & Proc. § 6705, at 398–99 (1992) (one

example of verbal act not offered to prove truth of matter asserted is "[a statement] offered to show that the listener conducted an adequate investigation."); *United States v. Blandina*, 895 F.2d 293, 300–01 (7th Cir. 1989) ("If someone ... conducts a fruitless investigation, he may, of course, testify that he did not find whoever or whatever he was looking for. But the significance of this testimony depends on the thoroughness of the investigation.... The responses that the witness received would be hearsay if offered to prove their truth. But the theory here is that the responses are offered, not for their truth, but only to prove how diligent the investigation was."). The May Soroos Affidavit therefore contains no inadmissible hearsay.

■ St. Paul objects that portions of the May Soroos Affidavit lack foundation; presumably St. Paul argues that because these portions lack foundation, Plaintiff and the Does have not shown that they are relevant and admissible. The portions to which St. Paul refers are those wherein Ms. Soroos attests that she asked Ms. Monty, Fr. McNamara, and Fr. Foley if they had any information about the Servants' insurance coverage from 1969 to 1971; St. Paul objects that Ms. Soroos laid no foundation that these individuals would have personal knowledge of the Servants' 1969–1971 insurance coverage. St. Paul's objection is disingenuous. First, in moving to strike Ms. Soroos' *January* affidavit, one of St. Paul's chief arguments was that Ms. Soroos never asked anyone about the existence of possible insurance record being kept somewhere other than Ms. Soroos' office. *See* St. Paul's Mem.Supp.Mot. Strike [Jan.] Aff. of Linda Soroos, at 6. Then, St. Paul does not contend that it or this Court does not know who these persons are or that they would not be relevant persons for Ms. Soroos to contact. St. Paul has access to the Soroos Deposition, part of the record before this Court, which clearly sets forth who Ms. Monty, Fr. McNamara, and Fr. Foley are, which in turn shows why they might have had personal knowledge of the Servants' insurance coverage from 1969 to

1971.[1] *See* Soroos Deposition, at 82 lines 1–10, at 6, lines 17–23, at 8, lines 2–14.

St. Paul correctly observes that an affidavit must be proper on its face. However, St. Paul is incorrect if it argues that the Court cannot consider the record before it in determining whether the facts the Soroos Affidavit sets forth are relevant. *See* Fed.R.Civ.P. 56(e) ("The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits."). Thus, the Court should not strike the indicated portions of the May Soroos Affidavit on the grounds that these portions lack foundation.

▉ St. Paul's sole valid objection to the May Soroos Affidavit is that Ms. Soroos stated, without affirmatively showing that she had personal knowledge thereof and was competent to testify thereon, that "[a]ll the Servants' files of the Servants' prior attorney are now in the files of the Servants or Alan Konrad's firm." May Soroos Affidavit ¶ 9. That Ms. Soroos has been the Servants' Administrator and keeper of insurance files and business records since 1975 does not affirmatively establish that she has personal knowledge of what became of all the files that the Servants' former attorney kept, or of what has become of the files Alan Konrad has kept. Ms. Soroos does not further clarify how she would have personal knowledge of these matters. In this respect the May Soroos Affidavit is defective under Rule 56(e), and the Court will strike paragraph 9 of the affidavit.

## III. THE DOES' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST ST. PAUL

▉ The Court will deny the Does' cross-motion for partial summary judgment against St. Paul. Plaintiff has made an unsuccessful, diligent, good faith search for the insurance policy St. Paul allegedly issued in its favor, and may therefore prove the policy's contents by secondary evidence. However, a genuine issue of material fact still exists regarding whether St. Paul issued Pol-

icy No. 530JB0433 in Plaintiff's favor, providing Owner's, Landlord's, and Tenant's ("OL & T") coverage from February 1, 1970 to February 1, 1971.

This Court has already held that Plaintiff conducted a diligent, good faith search for the St. Paul insurance policy it allegedly held from 1969 to 1971. *See Servants,* 857 F.Supp. at 828. In *Servants,* this Court noted that for Plaintiff to be permitted to introduce secondary evidence of the contents of the alleged insurance policy, Plaintiff first had to show that the original document was lost or destroyed in the absence of bad faith. *Id.* The Court then observed that Plaintiff could show loss or destruction in the absence of bad faith through the circumstantial evidence of a diligent but unsuccessful search for the document. *Id.* The Court next took note of "the affidavit of Linda Soroos, administrator of the Servants, who attests to the efforts made to locate the original policy." *Id.* The Court's opinion did not specify upon which Soroos Affidavit the Court relied; however, because this Court has declined to strike either affidavit as discussed *supra,* it will presently rely upon both the January and May Soroos Affidavits to reaffirm its holding that Plaintiff conducted the requisite unsuccessful, diligent search for the alleged St. Paul policy.

▉ More difficult is whether Plaintiff has introduced evidence that St. Paul issued an OL & T policy to it sufficient to entitle the Does to partial summary judgment. Under New Mexico law, Plaintiff bears the burden of proving the existence and terms of a lost insurance policy. *Servants,* 857 F.Supp. at 827; *Harden v. St. Paul Fire & Marine Ins. Co.,* 51 N.M. 55, 57, 178 P.2d 578, 579 (1947). Under the federal procedural law of this Court, Plaintiff must prove the existence and terms by a preponderance of the evidence. 857 F.Supp. at 827–28. The Court first notes that it has already determined that Plaintiff's evidence on this point was sufficient to *survive St. Paul's* motion for summary judgment. *Id.* at 829 ("Plaintiff has come for-

---

**1.** Ms. Monty is the former Administrator of Albuquerque Villa, a facility Plaintiff maintains. Fr. McNamara was Servant General of the Servants of the Paraclete, Inc., from 1968–1981. Fr. Foley was Servant General of the Servants from 1981–1986. Dep. Linda Soroos at 82, 6–8.

ward with sufficient evidence to raise a genuine issue of material fact as to whether it has shown the existence and terms of a St. Paul policy by a preponderance of the evidence."). However, the Court also notes that the opinion discussed Plaintiff's evidence regarding only Policy No. 589JA1915, not Policy No. 530JB0433. *Id.* at 828–29. Notwithstanding the Court's prior decision, Plaintiff at this stage must rely on the alleged policy numbered 530JB0433 to make its case, because Policy No. 589JA1915 was not effective until after the last dates of the Does' molestation.[2] In contrast, alleged Policy No. 530JB0433 *was* effective before the last dates of the Does' molestation. The alleged effective date of Policy No. 530JB0433 was February 1, 1970. While Plaintiff cannot rely on this policy regarding the New Mexico claimants, who allege abuse solely in 1968, Plaintiff can and does rely on this policy regarding the Minnesota claimants, who allege abuse as late as September 1970. *See id.* (granting St. Paul's motion for summary judgment regarding the New Mexico Does' claims).

Therefore, the Court must now consider whether the secondary evidence Plaintiff has offered to prove the existence and terms of an alleged policy numbered 530JB0433 entitles the Does to summary judgment. Plaintiff has offered the following secondary evidence regarding the *existence* of Policy No. 530JB0433:

1. St. Paul's policy register shows that it sent an unissued liability policy numbered 530JB0433, with Form No. 16101 (a declarations page) and Form No. 16100 (a policy jacket), to its Albuquerque service center on October 1, 1968. Dep. Karen Greeder at 14–15, 20, 37–38; Dep. Reuben Patrikus at 64. The parties do not dispute that St. Paul's usual purpose in sending unissued policies to its service centers was to issue the policies to the insureds from the centers.

2. The Account Current records of Blair White, an agent of St. Paul's at the relevant times, show that St. Paul issued Policy No. 530JB0433 to Plaintiff. Dep. Ex. 49; [June 1993] Dep. Blair White at 52–54. According to these records, which were prepared on February 25, 1970, Policy No. 530JB0433 was a liability policy for which Plaintiff paid a premium of $469.00; and, the policy was effective February 1, 1970. Dep. Ex. 49; Dep. Reuben Patrikus 118–21. Blair White testified that he sent a copy of the Account Current records to St. Paul each month, so that St. Paul could verify its receipt of premiums due. [June 1993] Dep. Blair White at 25, 33–34.

3. A St. Paul claims specialist, Reuben Patrikus, testified that he found no indication in Blair White's Account Current records or elsewhere that either St. Paul or Plaintiff cancelled the alleged Policy No. 530JB0433. Dep. Reuben Patrikus at 125–26. Furthermore, Mr. Patrikus testified that St. Paul had no evidence that it did not issue said policy. Dep. Reuben Patrikus at 123.

4. As St. Paul's agent, Blair White could commit St. Paul to the coverage requested in an insurance application, from the time of the application's submission. Dep. Kenneth Iverson at 57.

St. Paul challenges this evidence on the following points:

1. St. Paul conducted an extensive search of its *internal* records and located no evidence that it issued a policy to Plaintiff during the dates of molestation or manifestation. St. Paul Reply Mem.Supp.Mot. Partial Summ.J. at 3–4, 4 n. 2. Rather, the only information it located regarding policies issued to Plaintiff concerned an OL & T policy numbered 589JA1915, effective from November 1, 1971 to November 1, 1972. *Id.* at 4.

2. Form No. 16101, which was attached to an unissued policy numbered 530JB0433

---

**2.** Plaintiff does not now dispute St. Paul's contention that the alleged policy numbered 589JA1915 was not effective until some time in 1971, well after the last dates of molestation of either the New Mexico or the Minnesota Does. *See, e.g.,* John Does' Reply Mem.Supp. Cross–Mot. Partial Summ.J. Against St. Paul at 4 ("[St. Paul's] internal documentation indicates that the subsequent 589JA1915 policy was effective November 1, 1971, whereas the account current form shows that this policy was effective February 1, 1971.") The Court has found that the New Mexico claimants alleged abuse in the spring and summer of 1968, and the Minnesota claimants alleged abuse from August 1969 to September 1970. 857 F.Supp. at 830.

and sent to St. Paul's Albuquerque service center, was blank and the issuing agency had to fill it in before the policy would issue. Dep. Karen Greeder at 15, 37. Likewise, Form No. 16100, which was also attached to the unissued policy numbered 530JB0433, was merely a policy jacket containing general conditions applicable to many types of St. Paul insurance policies. Dep. Karen Greeder at 37–38.

3. Blair White acknowledged that his Account Current records contain a typographical error. [July 1993] Dep. Blair White at 39–40. Furthermore, the Account Current records indicate that Policy No. 530JB0433 was a renewal policy; however, in the year immediately preceding February 1, 1970, Great American, and not St. Paul, insured Plaintiff. Dep.Ex. 49; St. Paul Reply Mem. Supp.Mot. Partial Summ.J. at 14.

4. St. Paul's internal records indicate that the effective date of alleged Policy No. 589JA1915 was November 1, 1971. Plaintiff alleges that Policy No. 530JB0433 was effective from February 1, 1970 to February 1, 1971. If Plaintiff were correct as to the effective dates of Policy No. 530JB0433, Plaintiff would have been without insurance from February 1, 1971 to November 1, 1971.

Plaintiff responds to St. Paul's objections as follows:

1. The lack of St. Paul's internal documentation of Policy No. 530JB0433 is irrelevant because St. Paul has implemented no procedures for the systematic retention of information regarding policies it issued in the late 1960's or early 1970's. Dep. Diane Agren at 22; Dep. Paul Jensen at 30; Dep. Karen Greeder at 17; Dep. Reuben Patrikus at 22–23, 27.

2. The typographical error that St. Paul indicates in Blair White's Account Current records is unrelated to the policies numbered 530JB0433 and 589JA1915. Also, the Account Current records do not indicate whether the "renewal" code beside the Policy No. 530JB0433 notation indicates a renewal with the particular insurance company, a renewal with the agent Blair White, or something else.

3. Blair White's Account Current records show that the effective date of Policy No. 589JA1915 was February 1, 1971, which is perfectly consistent with the February 1, 1970 effective date of Policy No. 530JB0433. Does' Mem.Supp. Cross Mot. Partial Summ.J. Against St. Paul, Ex. G.

Plaintiff has offered the following secondary evidence regarding the *terms* of Policy No. 530JB0433:

1. Evidence cited above indicates that Policy No. 530JB0433 was a "liability" policy. *See* Dep. Karen Greeder at 14–15, 20, 37–38; Dep. Reuben Patrikus at 64; Dep. Ex. 49.

2. Form No. 16100, which Ms. Greeder testified was attached to the unissued policy numbered 530JB0433, is entitled "The St. Paul Liability Policy." Dep. Ex. 35.

3. From February 1, 1968 to February 1, 1969, and from February 1, 1969 to February 1, 1970, Great American issued an OL & T policy to Plaintiff, charging premiums of $400.00 and $378.00 respectively. Does' Mem.Opp. St. Paul's Mot.Summ.J. at 3; Aff. Thomas Racette, ¶ 1. Blair White's Account Current records show that St. Paul issued Policy No. 589JA1915 to Plaintiff effective February 1, 1971, charging a premium of $554.00. Does' Mem.Supp. Cross Mot. Partial Summ.J. Against St. Paul, Ex. G. Several insurance raters or coders testified that Policy No. 589JA1915 was probably an OL & T liability policy. *See* Dep. Diane Agren at 14; Dep. Reuben Patrikus at 55–57, 60–63, 70–71. Policy No. 530JB0433's alleged effective dates, February 1, 1970 to February 1, 1971, and its alleged premium, $469.00, are consistent with the proposition that Policy No. 530JB0433 was the third in a series of four consecutive OL & T policies.

4. St. Paul underwriter Kenneth Iverson produced a copy of the OL & T liability coverage form that St. Paul generally used in the late 1960's. Dep. Kenneth Iverson at 8–9, 14–15; Dep. Ex. 40. Plaintiff has also produced St. Paul's declarations page Form No. 16101, and St. Paul's liability policy jacket, Form No. 16100. Dep.Ex. 36; Dep.Ex. 35. Mr. Iverson testified that if St. Paul issued a liability policy in 1969 or 1970, it would have used Form No. 16101, Form No.

16100, and a coverage form. Dep. Kenneth Iverson at 68–69. Furthermore, Mr. Iverson testified that he knew of no OL & T coverage form St. Paul would have used in 1969 or 1970 other than the one he produced. *Id.*

5. St. Paul underwriter Paul Jensen testified that a service center underwriter would have to use St. Paul's standard form coverage parts in issuing St. Paul policies unless the underwriter obtained home office approval. Dep. Paul Jensen at 25.

In response, St. Paul correctly observes that Plaintiff's evidence directly supports only the assertion that Policy No. 589JA1915 was an OL & T policy, not that Policy No. 530JB0433 was. St. Paul also cites two cases in which, it argues, the alleged insured offered stronger secondary evidence of the existence and terms of an insurance policy than Plaintiff has, but in which the court found that such evidence was insufficient as a matter of law. In *Bituminous Casualty Corp. v. Vacuum Tanks, Inc.,* 975 F.2d 1130, 1132–33 (5th Cir.1992), the United States Court of Appeals for the Fifth Circuit held that the insured failed to produce sufficient evidence of the existence and terms of missing insurance policies for the court to make coverage decisions. The insured introduced the policy numbers, dates of coverage, and coverage amounts of the policies; however, the insured offered no evidence to prove the policies' actual terms.[3] *Id.*

Contrary to St. Paul's assertions, Plaintiff's secondary evidence of Policy No. 530JB0433 in this case is stronger than the insured's evidence in *Bituminous.* First, Plaintiff has produced the policy number, the dates of coverage, and the premium Plaintiff paid, as recorded in the Account Current records of St. Paul's agent. In addition, Plaintiff has offered St. Paul's internal documentation showing that St. Paul sent the unissued liability policy to its Albuquerque service center, presumably to be issued to the insured; Plaintiff has offered circumstan-

tial evidence that the policy was the third in a series of four consecutive OL & T liability policies; and, Plaintiff has offered the specimen OL & T policy that, according to two St. Paul underwriters, St. Paul most likely would have used in 1969 and 1970.[4]

St. Paul also cites *Boyce Thompson Institute for Plant Research, Inc. v. Insurance Co. of North America,* 751 F.Supp. 1137 (S.D.N.Y.1990); however, the holding in this case is clearly inapposite. The *Boyce* court found that the insured's evidence of missing insurance policies was insufficient to prove the existence or contents of the insurance *by clear and convincing evidence. Id.* at 1140–41. However, the Court has previously held in this case that the insured need only prove the existence and terms of a missing policy by a preponderance of the evidence. *Servants,* 857 F.Supp. at 828.

On the basis of the evidence listed *supra,* the Court finds that Plaintiff's evidence of the missing insurance policy numbered 530JB0433 is sufficient to survive a motion for summary judgment. However, Plaintiff's evidence is not so strong and so uncontroverted as to entitle Plaintiff to summary judgment on the issue of the policy's existence and terms. Reasonable minds could differ regarding whether Plaintiff has proved by a preponderance of the evidence that St. Paul issued Policy No. 530JB0433 to Plaintiff, that the policy was an OL & T liability policy, and that the terms of the OL & T policy were those of the OL & T specimen policy Plaintiff has offered. *See, e.g., American States Ins. Co. v. Mankato Iron & Metal, Inc.,* 848 F.Supp. 1436, 1440–41 (D.Minn. 1993) (holding that insured's evidence of existence and terms of missing insurance policy raised genuine issue of material fact where insured offered affidavits attesting to policy numbers and effective dates, fact that insurer issued policies, and fact that policies were comprehensive general liability policies; insured proved policies' terms from subsequent

---

3. The district court had before it one of the insurer's specimen comprehensive general liability policies; however, the court admitted the specimen solely for the limited purpose of demonstrating the contents of the insurer's file. *Id.* at 1133.

4. Plaintiff has offered the specimen to show the terms of Policy No. 530JB0433, not merely to show the contents of St. Paul's files; and, St. Paul has not objected on evidentiary grounds to the Plaintiff's use of the specimen.

policies insurer issued to insured). Two points support this conclusion. First, Plaintiff's evidence, while not inconsiderable, is circumstantial, and one may draw, or decline to draw, the necessary inferences; this choice is the appropriate province of the trier of fact. *Remington Arms Co. v. Liberty Mutual Ins. Co.,* 810 F.Supp. 1420, 1428 (D.Del.1992). Second, as the Court has already observed in this case, "Federal Rule of Evidence 1008 provides that when a question is raised as to whether a writing ever existed, or whether the evidence of the writing's contents reflects the actual contents, the issue is for the trier of fact to determine." *Servants,* 857 F.Supp. at 829. Because this fact issue exists, the Court will deny the Does' cross-motion for partial summary judgment.

## IV. PLAINTIFF'S MOTION FOR CONSOLIDATION

Plaintiff seeks to consolidate the present action with *Catholic Mutual Relief Society v. The Servants of the Paraclete, Inc., et al.,* Civ. 94–143 MV/LFG and *Catholic Mutual Relief Society v. The Servants of the Paraclete, Inc., et al.,* Civ. 94–144 LH/DJS, pursuant to Federal Rule of Civil Procedure 42(a). Federal Rule of Civil Procedure 42(a) states:

> When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

Fed.R.Civ.P. 42(a). Whether to grant a motion to consolidate under Rule 42(a) is in the trial court's discretion. *Frazier v. Garrison I.S.D.,* 980 F.2d 1514, 1531 (5th Cir.1993); *Shump v. Balka,* 574 F.2d 1341, 1344 (10th Cir.1978). The party moving for consolidation bears the burden of proving that consolidation is desirable. 5 James W. Moore & Jeremy C. Wicker, Moore's Fed.Prac. ¶ 42.04[1], p. 42–6 (1994) (citing cases). In deciding whether to grant a motion to consolidate, the Court should initially determine that the cases to be consolidated "involv[e] a common question of law or fact." Fed.

R.Civ.P. 42(a). If the cases involve a common question of law or fact, the Court should then weigh the interests of judicial convenience in consolidating the cases against the delay, confusion, and prejudice consolidation might cause. *Southwest Marine, Inc. v. Triple A Mach. Shop, Inc.,* 720 F.Supp. 805, 807 (N.D.Cal.1989). Applying these standards to the present motion, the Court finds that Plaintiff has not carried its burden of proving that consolidation is desirable, and that the Court can best "avoid unnecessary costs or delay" by declining to consolidate. *St. Bernard Gen. Hosp. v. Hospital Serv. Ass'n,* 712 F.2d 978, 989 (5th Cir.1983).

The Court first notes that the cases sought to be consolidated involve common questions of law or fact. The Servants filed Civ. No. 93–236 as a declaratory judgment seeking to determine the liability of several of its insurers for settlements the Servants reached with the Does, alleged victims of former priest Porter's sexual molestation. Catholic Mutual, Defendant in Civ. No. 93–236 (hereinafter "the Porter action"), brought the two declaratory judgment actions sought to be consolidated (hereinafter "the Holley action" and "the Sigler action"), seeking to determine its liability as Plaintiff's insurer, and the liability of certain other of Plaintiff's insurers, for former priests Holley's and Sigler's alleged sexual molestation of parish children. Catholic Mutual, Great American, and St. Paul, Plaintiff's insurers and parties to all three actions, have raised or will likely raise similar defenses to liability for the three former priests' acts, including whether Plaintiff has sufficiently proved the existence of lost policies, whether OL & T policies cover · Plaintiff's liability for the former priests' acts of sexual abuse, and, for Catholic Mutual, the "trigger of coverage" issue.

Despite these common issues, at least five factors militate against consolidating the three actions. First, the actions involve several separate factual issues, parties, and legal questions; thus, consolidation would not significantly conserve the Court's resources. The evidence to be offered in support of the three cases will likely differ considerably. Also, the Holley and Sigler actions would bring to the Porter action two additional

defendants, United States Fire Insurance Company and Royal Insurance Company of America, and with them additional factual issues. *See Great Am. Tool & Mfg. Co. v. Adolph Coors Co.,* 780 F.Supp. 1354, 1356 (D.Colo.1992) (consolidating cases where, *inter alia,* "both actions involve the same parties"); *but see St. Bernard,* 712 F.2d at 989 ("The fact that a defendant may be involved in one case and not the other is not sufficient to avoid consolidation."). Then, the Court's ruling of June 14, 1994 in the Porter action resolved many of the legal issues common to the three actions. Thus, in the cases sought to be consolidated, individual questions of law and fact may well predominate over common ones. *See Henderson v. National R.R. Passenger Corp.,* 118 F.R.D. 440, 441 (N.D.Ill. 1987) (declining to consolidate cases where, "[a]lthough certain common issues of fact may exist in both actions, the variety of individual issues predominate.").

Second, should the Court consolidate the Porter, Holley, and Sigler actions, it risks substantially delaying trial of the Porter action. Plaintiff filed the Porter action on January 25, 1993; the parties agree that discovery is virtually complete; and, the Court has set the Porter action's trial date for November 28, 1994. In contrast, Catholic Mutual did not file the Holley and Sigler actions until March of 1994, and discovery will remain open in these actions until at least January 25, 1995, nearly two months after the scheduled Porter trial. Federal courts have declined to consolidate cases involving common questions of law or fact where the cases were at different stages of preparedness for trial and where consolidation would delay the case ready for disposition. *See, e.g., Mills v. Beech Aircraft Corp.,* 886 F.2d 758, 762 (5th Cir.1989); *Petromanagement Corp. v. Acme–Thomas Joint Venture,* 835 F.2d 1329, 1334 (10th Cir.1988); *St. Bernard,* 712 F.2d at 990.

Third, consolidation would not significantly conserve the Court's resources because trying the Porter, Holley, and Sigler actions together would require a bifurcated factfinding procedure. The Porter action is to be tried to the Court; however, the Servants have requested that the Holley and Sigler actions be tried to a jury. Federal courts have often declined to consolidate cases requiring two different factfinders. *See, e.g., United States E.P.A. v. City of Green Forest,* 921 F.2d 1394, 1403 (8th Cir.1990); *Whiteman v. Pitrie,* 220 F.2d 914, 918 (5th Cir. 1955). The principle rationale for denying motions to consolidate jury and non-jury cases is that jury confusion and prejudice would likely result should the jury hear testimony irrelevant to the issues it must adjudicate. And while the Court could take steps to shield the jury from confusing or prejudicial testimony, such efforts would consume judicial resources and risk "transform[ing] the jury box into a carousel[,] with the jury moving in and out as each witness' testimony was fragmented to insure that the witness would not be able to testify before the jury as to that evidence which was solely admissible in the [non-jury] action." *Turner v. Transportacion Maritima Mexicana S.A.,* 44 F.R.D. 412, 419 (E.D.Pa.1968).

Two final factors suggest that the Porter, Holley, and Sigler actions should not be consolidated for trial. First, much duplicative effort and expense has already been avoided because the Court consolidated the Porter, Holley, and Sigler actions for all pre-trial matters on March 21, 1994. Second, the parties apparently do not object to the possible consolidation for trial of the Holley and Sigler actions, in which the issues and parties are more similar, in which the trial schedules are virtually identical, and which are both jury trials. (However, a motion to consolidate the latter two cases is not yet before the Court.) In view of these factors, and for the reasons discussed at length above, the Court will exercise its discretion to deny Plaintiff's motion to consolidate the Porter action, Civ. No. 93–236, with the Holley and Sigler actions, Civ. No. 94–143 and Civ. No. 94–144.

## V. GREAT AMERICAN'S MOTION FOR DISCLOSURE OF SETTLEMENT AMOUNTS AND OBJECTIONS TO ORDER OF UNITED STATES MAGISTRATE JUDGE DENYING DISCLOSURE OF SETTLEMENT AMOUNTS

The Court will affirm on other grounds Magistrate Judge Don J. Svet's Sep-

tember 30, 1994 denial of Great American's motion for disclosure of the amounts the Does received in settlement of their claims against Intervenors Fall River Diocese and the Archdiocese of Santa Fe. Contrary to Great American's arguments, the settlement amounts are not relevant to the reasonableness of the amounts the Does received in settlement of their claims against Plaintiff. Federal Rule of Civil Procedure 26 generally governs discovery; according to the rule, "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action.... The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1). The United States Supreme Court has construed relevance for the purposes of discovery "broadly[,] to encompass any matter that bears on, or that reasonably could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351, 98 S.Ct. 2380, 2389, 57 L.Ed.2d 253 (1978). *But see Mitchell v. Hutchings,* 116 F.R.D. 481, 483–84 (D.Utah 1987) ("If the evidence sought is not relevant, and thus inadmissible, and it does not appear that the evidence sought will lead to evidence that is admissible, then the court can properly limit discovery.").

Great American argues that the Fall River Diocese and Archdiocese settlement amounts are relevant to the reasonableness of Plaintiff's settlements with the Does. Initially, the Court notes that the reasonableness of Plaintiff's settlements with the Does *is* at issue in the present case. *See State Farm Fire & Cas. Co. v. Price,* 101 N.M. 438, 445, 684 P.2d 524, 531 (Ct.App.1984), *cert. denied,* 101 N.M. 362, 683 P.2d 44 (1984). The Washington Court of Appeals has listed several helpful factors by which to determine whether a settlement is reasonable:

> [T]he releasing person's damages; the merits of the releasing person's liability theory; the merits of the released person's defense theory; the released person's relative faults; the risks and expenses of continued litigation; the released person's ability to pay; any evidence of bad faith, collusion, or fraud; the extent of the releasing person's investigation and preparation of the case; and the interests of the parties not being released.

*Chaussee v. Maryland Cas. Co.,* 60 Wash. App. 504, 803 P.2d 1339, 1343 (1991). Great American argues that the Fall River Diocese and Archdiocese settlements are relevant to the reasonableness of Plaintiff's settlements with the Does in two respects, specifically, (1) the Does' damages and (2) any evidence of bad faith, collusion, or fraud. Great American argues the relevance of these settlements as follows:

> [L]et us assume that a particular Doe has suffered overall damages from sexual molestation of $100,000 and that Doe has entered into a stipulated judgment with the Servants of the Paraclete of $80,000. With $100,000 in damages and a stipulated judgment of $80,000, Doe might argue that his settlement with the Servants of the Paraclete was *prima facie* reasonable. Suppose, however, that this particular Doe had reached a prior settlement with the Fall River Diocese of $80,000. Armed with this information, Great American could argue that Doe's settlement with the Servants of the Paraclete was "unreasonable" since Doe was seeking to obtain, in the guise of a stipulated judgment, an amount which exceeded reasonable damages for his injuries.

Great Am. Ins. Cos.' Mem.Supp.Mot. Disclosure Settlement Amounts at 2–3. While Great American's argument is superficially persuasive, it must fail because it ignores New Mexico law on comparative fault and several liability. According to New Mexico law, "in any cause of action to which the doctrine of comparative fault applies," joint tortfeasors are severally, but not jointly, liable. N.M. Stat. Ann. § 41–3A–1(A) (Michie 1989). As such, any joint tortfeasor is "liable only for that portion of the total dollar amount awarded as damages to the plaintiff that is equal to the ratio of such defendant's fault to the total fault attributed to all persons, including plaintiffs, defendants *and persons not party to the action.*" N.M. Stat. Ann. § 41–3A–1(B) (emphasis added). Thus, a joint tortfeasor who is severally liable is not entitled to contribution, and the judgment

against him or her will not be reduced by any amount the plaintiff has recovered from any other joint tortfeasor. N.M. Stat. Ann. § 41–3A–1(E). Likewise, the New Mexico Supreme Court has recently observed that "a party's liability for proportionate fault is *unaffected by the injured party's settlement with others* who are severally liable for their own proportionate fault." *Sanchez v. Clayton*, 117 N.M. 761, 766, 877 P.2d 567, 571 (N.M.1994) (emphasis added); *see also Wilson v. Galt*, 100 N.M. 227, 232, 668 P.2d 1104, 1109 (Ct.App.), *cert. quashed*, 100 N.M. 192, 668 P.2d 308 (1983).

Applying this law to Great American's hypothetical, one can see that the Fall River Diocese and Archdiocese settlements can legally have no effect whatsoever on the Does' damages for which Plaintiff might be liable. No one disputes that the Does have alleged in various underlying claims that Fall River Diocese, the Archdiocese, and Plaintiff are joint tortfeasors whose negligence proximately caused the Does' sexual molestation. As such, under comparative negligence principles, Fall River Diocese, the Archdiocese, and Plaintiff would be severally liable for the Does' injuries. Plaintiff's liability for its proportionate fault would be "unaffected by the [Does'] settlement with [Fall River Diocese and the Archdiocese] who are severally liable for their own proportionate fault." *Sanchez*, 117 N.M. at 766, 877 P.2d at 571.

Returning to Great American's hypothetical, suppose that Fall River Diocese was 50% at fault in causing a particular John Doe's injuries and that Plaintiff was also 50% at fault. Again, assume that Doe's injuries totalled $100,000. Under New Mexico principles of comparative fault and several liability, Plaintiff is *always* potentially liable for 50% of Doe's damages, or $50,000, *regardless of what Fall River Diocese may have paid Doe in settlement.* If Fall River paid Doe $80,000, then under New Mexico law Plaintiff would be potentially liable for $50,000, and Doe would retain the $30,000 benefit of his contractual bargain. If Fall River paid Doe $20,000, then Plaintiff would be potentially liable for $50,000, and $30,000 of Doe's dam-

ages would go uncompensated because Doe could not collect damages for Fall River's proportionate fault from Plaintiff. As far as Plaintiff is concerned, Doe's damages are always equal to Doe's total damages, $100,000, multiplied by Plaintiff's proportionate fault, 50%, or $50,000. Neither Doe's total damages nor Plaintiff's proportionate fault depends in any way upon the amount of Fall River Diocese's settlement with Doe; therefore, that settlement amount could not reasonably bear on Plaintiff's potential liability for Doe's damages and thus on the reasonableness of Plaintiff's settlement with Doe.

Great American also argues that the Fall River Diocese and Archdiocese settlement amounts are relevant to whether Plaintiff's settlements with the Does involved bad faith, collusion, or fraud. According to Great American, it is entitled to discover whether Plaintiff and the Does agreed in bad faith to stipulated judgments that, combined with the Fall River and Archdiocese settlements, exceed the Does' total damages. New Mexico law on comparative negligence and several liability forecloses this argument as well. According to the New Mexico Supreme Court, "[l]iability for proportionate fault is a liability for a distinct part of the damages and not for the same damages that may be apportioned to others." *Sanchez*, 117 N.M. at 766, 877 P.2d at 571. Also, the New Mexico Court of Appeals has observed that "[i]f the injured person pursues his claim against the other tortfeasors, recovery will only be against them for their respective shares of fault. Thus, the injured person, by settling, would not recover more than his total damages, because *each tortfeasor would pay, by settlement or judgment, only his respective share.*" *Wilson*, 100 N.M. at 232, 668 P.2d at 1109.[5] In other words, under New Mexico law, each tortfeasor's liability is analytically distinct, and one must therefore examine Doe's recovery from each tortfeasor separately.

Turning again to the hypothetical Doe who suffered $100,000 in damages, the issue under New Mexico law is not whether Fall River Diocese and Plaintiff have together

---

**5.** This law renders inapplicable the cases that Great American has cited for the general propo-

sition that a tort victim can only recover once for his or her injuries.

paid Doe more than $100,000, and whether Plaintiff knew Doe would receive and collusively allowed Doe to receive, *in toto,* double recovery. Rather, the issue under New Mexico law must be whether Fall River Diocese collusively settled for more than its respective share of $50,000, and whether Plaintiff collusively settled for more than its $50,000 share.

The Court also notes that the public policy encouraging settlement, as embodied in Federal Rule of Evidence 408,[6] may have somewhat tempered the liberal breadth of Rule 26(b) as applied to discovery of settlement negotiations and agreements. Federal Rule of Evidence 408 does not bar *discovery* of settlement negotiations or amounts, *see* Fed. R.Evid. 408; *In Re General Motors Corp. Engine Interchange Litig.,* 594 F.2d 1106, 1124 n. 20 (7th Cir.1979). Also, Rule 408 only bars *admissibility* for purposes of proving existence or absence and amount of liability. *General Motors,* 594 F.2d at 1124 n. 20. However, many federal courts that have considered the discoverability of settlement negotiations or agreements have explicitly or impliedly found that Rule 408 expresses the policy of protecting settlement negotiations and agreements from unnecessary intrusions in order to encourage settlements. *See, e.g., Fidelity Fed. Sav. & Loan Ass'n v. Felicetti,* 148 F.R.D. 532, 534 (E.D.Pa.1993) ("Evidence or offers of settlements are excluded from trial so as to promote non-judicial resolution of disputes."); *Bottaro v. Hatton Assoc.,* 96 F.R.D. 158, 160 (E.D.N.Y.1982) (noting "the strong public policy of favoring settlements and the congressional intent to further that policy by insulating the bargaining table from unnecessary intrusions"). In view of this strong public policy, which conflicts with the similarly strong policy favoring broad discovery, *see, e.g., Vardon Golf Co. v. BBMG Golf Ltd.,* 156 F.R.D. 641, 650 (N.D.Ill.1994), the *Bottaro* court and the courts following its reasoning have held that

the party moving for discovery of settlement negotiations or agreements must make some particularized showing that the information sought is reasonably calculated to lead to admissible evidence. *Shipes v. Bic Corp.,* 154 F.R.D. 301, 309 (M.D.Ga.1994); *Felicetti,* 148 F.R.D. at 533–534; *Morse/Diesel Inc. v. Trinity Indus., Inc.,* 142 F.R.D. 80, 82–84 (S.D.N.Y.1992); *Weissman v. Fruchtman,* No. 83 Civ. 8958, 1986 WL 15669, at *19 (S.D.N.Y.1986); *Olin Corp. v. Insurance Co. of N. Am.,* 603 F.Supp. 445, 449–450 (S.D.N.Y.1985); *Bottaro,* 96 F.R.D. at 159–160.

Nevertheless, the Court observes that least one federal court, while agreeing that the party moving for discovery should bear the burden of showing Rule 26(b) relevance, has held that the movant need not make a particularized showing, *see Vardon Golf Co.,* 156 F.R.D. at 650; and, some federal courts have either declined to modify the Rule 26(b) standard as applied to discovery of settlement negotiations or agreements, *see Morse/Diesel, Inc. v. Fidelity & Deposit Co.,* 122 F.R.D. 447, 449 (S.D.N.Y.1988); *Bennett v. La Pere,* 112 F.R.D. 136, 138–41 (D.R.I. 1986), or have found it unnecessary to determine which standard to apply, *see Serina v. Albertson's, Inc.,* 128 F.R.D. 290, 293 (M.D.Fla.1989). This Court, as the court in *Serina,* need not at this time decide which standard to apply, because "under either test [Great American] has failed to meet [its] burden of making out a factual basis for [its] claim of relevance of the settlement information sought." 128 F.R.D. at 293.

## VI. PLAINTIFF'S AND THE JOHN DOES' MOTION FOR AMENDMENT AND CLARIFICATION OF JUDGMENT AGAINST CATHOLIC MUTUAL

 The Court will deny in part and grant in part Plaintiff's and the Does' motion for amendment and clarification of the

---

**6.** Federal Rule of Evidence 408 states in pertinent part:

Evidence of (1) furnishing or offering to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible.

Fed.R.Evid. 408.

Court's June 14, 1994 order. This Court correctly held that under New Mexico law as the New Mexico Supreme Court would probably decide it, an insurer that unjustifiably breaches its duty to defend does not thereby become automatically liable for any reasonable, good faith settlement into which its insured enters. No New Mexico court has held otherwise; the decision is in accord with basic principles of New Mexico law; and, the majority of United States courts and commentators agree with the Court's position. In addition, while Plaintiff *may* be entitled to contractual damages in the amount of its reasonable, good faith settlements with the Does, Plaintiff bears the burden of proof on this point.

In its June 14, 1994 order, the Court held that Catholic Mutual breached its duty to defend Plaintiff against the Does' underlying claims. *Servants,* 857 F.Supp. at 833. In addition, it held that Catholic Mutual's breach of its duty to defend did not render Catholic Mutual automatically liable for any reasonable, good faith settlement between Plaintiff and the Does; in other words, it held that Catholic Mutual was not estopped from arguing that the Catholic Mutual policies issued to Plaintiff did not cover Plaintiff's liability for the Does' underlying claims. *Id.* at 833-34. Plaintiff and the Does assert that this decision is contrary to New Mexico law, which the Court must apply under *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

Plaintiff and the Does are correct that when the Court sits in diversity, as here, it must ascertain and apply state substantive law. *See Erie,* 304 U.S. at 78, 58 S.Ct. at 822; *Perlmutter v. United States Gypsum Co.,* 4 F.3d 864, 869 (10th Cir.1993). The New Mexico Supreme Court's pronouncements of state law are binding on this Court while sitting in diversity. *Perlmutter,* 4 F.3d at 869 n. 2 (*citing Menne v. Celotex Corp.,* 861 F.2d 1453, 1464 n. 15 (10th Cir.1988)). Where, however, the New Mexico Supreme Court has not addressed an issue, this Court must anticipate how that court would rule and hold accordingly, *Adams–Arapahoe Schl. Dist. No. 28–J v. GAF Corp.,* 959 F.2d 868, 871 (10th Cir.1992); in so predicting, the

Court will consider "state court decisions, decisions of other states, federal decisions, and the general weight and trend of authority." *Armijo v. Ex Cam. Inc.,* 843 F.2d 406, 407 (10th Cir.1988). The New Mexico Supreme Court has not addressed whether an insurer who has unjustifiably breached its duty to defend is estopped from denying coverage and is automatically liable for any reasonable, good faith settlement into which its insured enters. The Court in its June order, having considered intermediate state court opinions, other state court opinions, federal decisions, and the general weight and trend of authority, correctly determined that the New Mexico Supreme Court, if faced with this issue, would hold that an insurer who unjustifiably breaches its duty to defend is not thereby automatically liable for its insured's reasonable, good faith settlement of the underlying claim. *See Servants,* 857 F.Supp. at 833-34.

In arguing that the Court wrongly decided this issue, Plaintiff and the Does offer no new caselaw. They again rely upon *State Farm Fire & Cas. Co. v. Price,* 101 N.M. 438, 684 P.2d 524 (Ct.App.), *cert. denied,* 101 N.M. 362, 683 P.2d 44 (1984), and *American Gen. Fire & Cas. Co. v. Progressive Cas. Co.,* 110 N.M. 741, 799 P.2d 1113 (1990). The Court has already addressed these two cases and has conclusively rejected Plaintiff's and the Does' reading of them. *See Servants,* 857 F.Supp. at 833; *see also* Allan W. Windt, Insurance Claims & Disputes § 4.35, p. 213 (1988) ("The vast majority of cases have properly held that an insurer's unjustified refusal to defend does not estop it from later denying coverage under its duty to indemnify.... The insurer's breach of contract should not ... be used as a method of obtaining coverage for the insured that the insured did not purchase."); 7C Appleman, Insurance Law & Prac. § 4690, p. 235 (Berdal ed. 1979) ("Although the insured can make such settlements as his interests require, such a settlement is not conclusive upon the insurer which still has a right to be heard on the question of policy coverage.") (citing cases). Plaintiff and the Does have failed to establish that the Court's prior determination was in any way erroneous.

■ Plaintiff and the Does next ask the Court to clarify its June 14, 1994 order in two respects. First, Plaintiff and the Does wish the Court to clarify that it did *not* hold that an insurer who unjustifiably fails to defend can *never* be liable for the insured's reasonable, good faith settlement of the underlying claim if a court later determines that the insured's policy does not cover the claim. Plaintiff and the Does are correct in that the Court did not so hold; the Court will therefore grant Plaintiff's and the Does' motion for clarification on this point only. In *Servants,* this Court held that "[w]here an insurer unjustifiably refuses to defend, it has breached the insurance contract and normal contract damages principles should be applied. The injured party in a contract breach is entitled to receive what would have been obtained had there been no breach." 857 F.Supp. at 833 (citations omitted). The opinion did not further discuss the possible content of ordinary contract damages in this context. In order to determine whether the opinion definitively barred Plaintiff from receiving contractual damages in the amount of its reasonable, good faith settlements of the Does' claims, then, one must examine the ordinary contract law of damages.

New Mexico contract law on damages is generally in accord with basic Restatement principles. *See* Restatement (Second) of Contracts §§ 347, 351, 352 (1981). The New Mexico Supreme Court has observed that "[o]ne who fails to perform his contract is justly responsible for all of the damages flowing naturally from the breach." *Shaeffer v. Kelton,* 95 N.M. 182, 187, 619 P.2d 1226, 1231 (1980). Thus, "the nonbreaching party [may] recover the loss in value of the performance promised by the breaching party, less any cost or other loss that the nonbreaching party has avoided by not having to perform. In addition to these 'general' damages, the nonbreaching party may in some circumstances be entitled to recover consequential or 'special' damages." *Torrance County Mental Health Program v. New Mexico Health & Env't Dep't,* 113 N.M. 593, 601–02, 830 P.2d 145, 153–54 (1992) (citations omitted). The *Torrance* court observed that the nonbreaching party could recover consequential damages if the breaching party could have fore-

seen the loss at the time of contracting. *Id.* at 602, 830 P.2d at 154. The New Mexico Supreme Court has also held that "[d]amages based on surmise, conjecture or speculation cannot be sustained. Damages must be proved with reasonable certainty." *Mascarenas v. Jaramillo,* 111 N.M. 410, 415, 806 P.2d 59, 64 (1991). However, the New Mexico Supreme Court has noted that while it will not tolerate uncertainty as to the *cause* of damage, it does not require mathematical certainty as to the *amount* of damage. *See Ranchers Exploration & Dev. Co. v. Miles,* 102 N.M. 387, 389, 696 P.2d 475, 477 (1985); *United Nuclear Corp. v. Allendale Mut. Ins.,* 103 N.M. 480, 488, 709 P.2d 649, 657 (1985). Thus, Plaintiff will be entitled to consequential damages in the amount of its reasonable, good faith settlements with the Does if it can show that this loss flowed naturally from Catholic Mutual's failure to defend and that Catholic Mutual could have foreseen the loss at the time of contracting, and if it can establish with reasonable certainty that Catholic Mutual caused the loss. Therefore, the Court will grant Plaintiff's and the Does' motion for clarification and hold that its June 14, 1994 order did not foreclose the possibility that Plaintiff's consequential damages under ordinary principles of contract law may include amounts equal to its reasonable, good faith settlements with the Does, should Plaintiff offer the requisite proof discussed *supra.*

■ Plaintiff and the Does further move, however, that the Court should amend its June 14, 1994 order to hold that where an insurer unjustifiably fails to defend, the Court will shift the burden of proving damages onto the insurer, that is, the Court will require the insurer to prove that the insured's reasonable, good faith settlement was *not* a consequential damage of the insurer's failure to defend. The Court declines to so rule. Generally, the plaintiff in a contract action must prove his or her damages by a preponderance of the evidence in order to be entitled to compensation for them, *Mitchell v. Lovato,* 97 N.M. 425, 427, 640 P.2d 925, 927 (1982); *Stevens v. Mitchell,* 51 N.M. 411, 414, 186 P.2d 386, 389 (1947). The rule appears to be no different for insurance contracts than for other types of contracts. *See* 19

Ronald A. Anderson & Mark S. Rhodes, Couch Cyclopedia of Ins. Law § 79:367, p. 318 (1983) ("Clearly, as part of his prima facie case, the insured must prove the amount of his damages.") (citing cases).

Plaintiff and the Does have presented the Court with virtually no state or federal law directly supporting their proposed alteration of this general rule, and scarce indirect support either. Plaintiff and the Does first refer the Court to *Roberts Oil v. Transamerica Ins. Co.*, 113 N.M. 745, 833 P.2d 222 (1992). In *Roberts*, the New Mexico Supreme Court held that the insurer bore the burden of persuading the trier of fact that the insured's conduct in breaching an insurance policy provision prejudiced the insurer. *Id.* at 756–57, 833 P.2d at 233. According to Plaintiff and the Does, this case stands for the proposition that the burden of proving prejudice or lack thereof is always upon the insurer, both when the insurer is the breaching party and "even in situations in which it is the insured which has breached the contract." Plaintiff's Mem. Law Supp.Mot. Amendment Clarification J. at 13. As Catholic Mutual observes, such a reading is absurd: *Roberts* merely places the burden of persuasion of prejudice upon the party asserting breach of contract and seeking relief therefrom, *i.e.*, in *Roberts*, the insurer. Applying *Roberts* to the matter before the Court, the burden of proof of prejudice is upon Plaintiff and the Does, the parties asserting breach of contract and seeking relief therefrom.

Plaintiff and the Does next cite *Gonzales v. Rivera*, 37 N.M. 562, 25 P.2d 802 (1933), in which the New Mexico Supreme Court held that, where the defendants violated a covenant not to compete, the defendants had engaged in "such wrongdoing that sound policy requires that the risk of estimating the damages too high or too low should be thrown upon [the defendants]." *Id.* at 565,

25 P.2d at 805. This case is irrelevant to Plaintiff's and the Does' position for at least two reasons. First, the *Gonzales* court threw upon the defendants the burden of disproving only the *amount*, but not the *cause*, of the plaintiff's damages; and, as noted above, under New Mexico law, while a plaintiff must prove the cause of his or her damages with reasonable certainty, he or she need not so prove the amount of damages. *See, e.g., Ranchers Exploration*, 102 N.M. at 389, 696 P.2d at 477 (1985).[7] Second, the *Gonzales* court held only that violation of a covenant not to compete was "such wrongdoing" as to shift the burden of proving amount of damages from the plaintiff to the defendants; the court made no such policy judgment regarding an insurer's breach of the duty to defend. *See generally id.*

Having failed to unearth any New Mexico law supporting its argument and that of the Does, Plaintiff next turns to cases of the federal courts and the courts of other states, with no greater success. Plaintiff cites *Triple U Enterprises, Inc. v. New Hampshire Insurance Co.*, 766 F.2d 1278, 1283 (8th Cir. 1985), and *Space Conditioning v. Insurance Co. of North America*, 294 F.Supp. 1290, 1296 (E.D.Mich.1968); however, these cases are clearly inapposite because the insurance policy at issue in the cases actually covered some part of the jury verdict, while in the matter before the Court, the Catholic Mutual policies do not cover any part of the Does' underlying claims against Plaintiff. Plaintiff also offers to the Court two decisions of other states' courts, and explains the decisions in a highly questionable manner. According to Plaintiff, both *Servidone Construction Corp. v. Security Insurance Co.*, 64 N.Y.2d 419, 488 N.Y.S.2d 139, 477 N.E.2d 441 (1985), and *Maynard v. Sauseda*, 121 Mich.App. 644, 329 N.W.2d 774 (1982), "place[ ] the burden of proof on the insurer

---

**7.** One may make the same observation regarding the passage Plaintiff and the John Does have cited from American Jurisprudence Second. According to this passage, where a party whose performance depends upon the happening of a fortuitous event breaches the contract before the event has occurred, the nonbreaching party *is* entitled to damages based on "the value of the conditional right at the time of breach." 22 Am.Jur.2d *Damages* § 46, p. 70 (1988). In addi-

tion, the difficulty of proving the value of the conditional right "should not be charged to the injured party, since the difficulty in computing damages was caused by the defendant's wrong." *Id.* In such a situation, the question is not whether the breaching party *caused* the nonbreaching party's loss, *i.e.*, the loss of the conditional right; rather, the question is the *amount* of the loss, or, the value of that conditional right.

which had breached its duty to defend." Plaintiff's Reply Mem.Supp.Mot. Amendment Clarification J. at 10. However, neither *Servidone* nor *Maynard* place upon the insurer the burden of proving whether the insurer's failure to defend caused the insured's loss. The cases are therefore inapplicable to the matter before the Court.

Because Plaintiff and the Does have come forward with little or no legal support for their argument that the Court should shift to Catholic Mutual the burden of establishing whether Catholic Mutual's breach of the duty to defend caused Plaintiff damages in the amount of its settlements with the Does,[8] the Court declines to so deviate from the ordinary principles of contract law. Thus, the Court will deny Plaintiff's and the Does' motion to amend the Court's June 14, 1994 order to hold that Catholic Mutual must bear the burden of disproving that Plaintiff's consequential damages include its reasonable, good faith settlements with the Does.

### VII. CATHOLIC MUTUAL'S MOTION FOR PARTIAL SUMMARY JUDGMENT ESTABLISHING THE EXTENT OF CATHOLIC MUTUAL'S LIABILITY AS A RESULT OF BREACHING ITS DUTY TO DEFEND

### VIII. CATHOLIC MUTUAL'S MOTION FOR PARTIAL SUMMARY JUDGMENT DISMISSING PLAINTIFF'S EXTRA–CONTRACTUAL CLAIMS

Defendant Catholic Mutual filed two motions for partial summary judgment on August 4, 1994 and August 5, 1994, respectively. On March 15, 1994, Magistrate Judge Don J. Svet entered an order extending the deadline for pretrial motions other than discovery motions to May 23, 1994. The Court has not located any more recent orders extending this deadline, either generally or with respect to the above-referenced motions. Therefore, Catholic Mutual untimely filed its partial summary judgment motions. Plaintiff referred the Court to the motions' untimeliness in its Memoranda in Opposition to the motions. *See* Plaintiff's Mem.Opp. Catholic Mutual's Mot. Partial Summ.J. Establishing Extent Catholic Mutual's Liability Result Breach Duty Defend at 1 n. 1; Plaintiff's Mem.Opp. Catholic Mutual's Mot. Partial Summ.J. Plaintiff's Extra–Contractual Claims at 1 n. 1. The Court will therefore strike Catholic Mutual's partial summary judgment motions for untimeliness.

### IX. CATHOLIC MUTUAL'S MOTION FOR ENTRY OF PARTIAL FINAL JUDGMENT PURSUANT TO RULE 54(b)

Catholic Mutual's motion for entry of partial final judgment depends upon, *inter alia*, the Court's "anticipated rulings on extracontractual claims and extent of damages." Catholic Mutual's Mem.Supp.Mot. Entry Partial Final J. at 7. For Catholic Mutual to be entitled to partial final judgment, the Court must have granted Catholic Mutual's motions for partial summary judgment on the extent of Catholic Mutual's liability for breach of its duty to defend and on Plaintiff's extra-contractual claims against Catholic Mutual. However, The Court has held *supra* that it will strike these motions on grounds of untimeliness. Thus, several claims against Catholic Mutual have not been resolved, and entry of partial final judgment against Catholic Mutual is premature.

### X. GREAT AMERICAN'S MOTION TO ALTER OR AMEND JUDGMENT

The Court will deny in part and grant in part Great American's motion to alter or amend the Court's June 14, 1994 order. In that order, the Court first held that although Great American had breached its duty to defend Plaintiff against the Minnesota Does'

---

8. The Court is aware that a commentator on insurance law has observed that a court could "shift the burden of proof and require the insurer to demonstrate the absence of a causal relation between its breach of its duty to defend and the ... settlement," rather than estop an insurer that unjustifiably fails to defend from denying cover-

age. Allan A. Windt, Insurance Claims & Disputes § 4.35, p. 215 (1988). However, the commentator cites no cases in support of this statement and finds that "[t]he better rule, and the one followed by most courts, is to award such consequential damages *only when they can be proved by the insured.*" *Id.* (emphasis added).

underlying claims, Great American could nonetheless contest coverage of the Does' claims under the policy it issued to Plaintiff. *Servants,* 857 F.Supp. at 835. The Court then found that the OL & T policy Great American issued to Plaintiff did cover the Does' claims; the Court therefore concluded that "Great American ... had a duty to indemnify those claims." *Id.* at 836–37. Great American does not seek reconsideration of the Court's determination that the OL & T terms of the policy it issued to Plaintiff did not exclude coverage of the Does' underlying claims. However, Great American asserts that it has raised or intends to raise several other coverage defenses, which will preclude its having breached a duty to indemnify.[9] Great American therefore argues that the Court's finding that Great American had a duty to indemnify Plaintiff was premature, and that the Court should amend its order accordingly.

■ The Court may appropriately amend a summary judgment under Rule 59(e). *Northern Cheyenne Tribe v. Hodel,* 851 F.2d 1152, 1155 (9th Cir.1988). Whether to grant a Rule 59(e) motion is in the Court's sound discretion. *Hancock v. City of Okla. City,* 857 F.2d 1394, 1395 (10th Cir.1988); *McMahon v. Libbey–Owens–Ford Co.,* 870 F.2d 1073, 1078 (6th Cir.1989); *Roudybush v. Zabel,* 813 F.2d 173, 178 (8th Cir.1987). Generally, courts will grant Rule 59(e) motions on one of three grounds, specifically, "a manifest error of law or fact, the discovery of new evidence, or an intervening change in the law." *Hayes v. Douglas Dynamics, Inc.,* 8 F.3d 88, 91 n. 3 (1st Cir.1993); *School Dist. No. 1J v. ACandS, Inc.,* 5 F.3d 1255, 1263 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2742, 129 L.Ed.2d 861 (1994). More specifically, the Court may appropriately grant a Rule 59(e) motion where "the court has obviously misapprehended a party's position or the facts or the law, or ... mistakenly decided issues outside of those the parties presented for determination." *Anspach v. Tomkins Indus., Inc.,* 817 F.Supp. 1499, 1518 (D.Kan.1993).

■ However, "Rule 59(e) motions 'are aimed at *reconsideration,* not initial consideration.'" *F.D.I.C. v. World Univ., Inc.,* 978 F.2d 10, 16 (1st Cir.1992) (emphasis in original). A party may not use Rule 59(e) to raise legal arguments that it could and should have raised before the court issued its judgment. *Steele v. Young,* 11 F.3d 1518, 1520 n. 1 (10th Cir.1993) ("Rule 59(e) cannot be used to expand a judgment to encompass new issues which could have been raised prior to issuance of the judgment."). This rule applies to cases involving summary judgment as well as those involving judgment after trial. *See, e.g., Buell v. Security Gen. Life Ins. Co.,* 784 F.Supp. 1533, 1536 (D.Colo. 1992), *aff'd,* 987 F.2d 1467 (10th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 308, 126 L.Ed.2d 255 (1993) ("A party cannot invoke Rule 59(e) to raise arguments or evidence that could and should have been presented during the summary judgment process.").

Applying these rules to the present matter, the Court will grant Great American's Rule 59(e) motion to the extent that the Court has made any manifest factual or legal errors, and in particular to the extent it has overlooked a matter raised in the summary judgment materials which, had it been considered, might reasonably have altered the judgment. *Anspach,* 817 F.Supp. at 1518; *Starr v. JCI Data Processing, Inc.,* 767 F.Supp. 633, 635 (D.N.J.1991). However, the Court will deny Great American's Rule 59(e) motion to the extent that Great American now attempts to present legal arguments it could and should have raised "during the summary judgment process." *Buell,* 784 F.Supp. at 1536.

In order to determine which arguments Great American could and should have raised, the Court must first briefly consider the scope of the motions that were before the

---

**9.** *Inter alia,* Great American has asserted or intends to asserts that the OL & T policy at issue contained a professional services malpractice exclusion and a non-insured premises exclusion, that Plaintiff failed to timely notify Great American of the Does' claims, and that Plaintiff's loss was nonfortuitous. Also, Great American has raised or intends to raise several arguments concerning the *extent* of its liability for its alleged breach of the duty to indemnify, concerning policy limits, whether Plaintiff settled with the New Mexico Does without Great American's consent, and whether Plaintiff's settlements with all of the Does were reasonable and in good faith.

Court on its June 14, 1994 order. Great American argues that the parties sought summary judgment *solely* on the issues of (i) lost policy, (ii) scope of an OL & T insurance policy, and (iii) whether an insurer is estopped from raising coverage defenses by breaching a duty to defend. However, Great American's argument merely highlights the issues that the parties primarily raised; it does not identify every issue the parties raised, nor does it indicate every issue the parties could or should have raised. Rather, the scope of the motions before the Court were as follows: Great American sought full summary judgment on the issue of its liability for alleged breach of both its duty to defend and its duty to indemnify, *see* Mem. Supp. Great American Mot.Summ.J. at 1, and Plaintiff and the Does sought partial summary judgment declaring that Great American breached its duty to defend and to indemnify Plaintiff. *See* Plaintiff's Mem. Law Opp. Great American's Mot.Summ.J. & Supp. Plaintiff's Cross–Mot. Partial Summ.J. at 1; Plaintiff's Reply Supp. Cross–Mot. Partial Summ.J. Against Great American at 1. Thus, whether Great American had a duty to indemnify Plaintiff was squarely before the Court. Logically included in this issue is whether Great American possessed any coverage defenses that would preclude its having a duty to indemnify Plaintiff. Not included, however, is the extent of Great American's liability for its alleged breach of that duty.

The Court overlooked one of Great American's proposed coverage defenses in deciding its June 14, 1994 order. In the materials before the Court on Great American's motion for summary judgment and Plaintiff's and the Does' cross-motions for partial summary judgment, the parties definitely raised and discussed the possibility that the OL & T policy Great American issued to Plaintiff contained an applicable professional services malpractice exclusion. *See* Aff. James A. Robertson, ¶ 4 (filed May 9, 1994, "in opposition to the cross-motions for partial summary judgment made by plaintiff Servants of the Paraclete, Inc. and by the defendant Does I–XVI and Does I–IV" and stating that Great American OL & T policy in question likely contained malpractice exclusion); Great

American's Mem.Opp. Cross–Mot. Partial Summ.J. & Consolidated Reply Mem.Supp. Great American's Mot.Summ.J. at 14 (arguing that Plaintiff bore burden of proving professional services malpractice exclusion as part of lost policy's terms); Plaintiff's Reply Supp. Cross–Mot. Partial Summ.J. Against Great American at 7 (arguing that Great American bore burden of proving malpractice exclusion and that exclusion would not be applicable to present case); Does' Reply Great American's Mem.Opp. Does' Cross Mot.Summ J. at 10 (same); *see also* Great American's Answer Amended Compl.Decl.J. & Breach Contract ¶ 31.2.

This matter, if the Court had considered it, might reasonably have altered the Court's judgment. If the party bearing the burden of proving the malpractice exclusion established that the Great American OL & T policy contained the exclusion, and if Great American established that the exclusion applied to the Does' underlying claims, then Great American would not have a duty to indemnify Plaintiff, even though the general terms of the Great American OL & T policy covered the Does' claims. The Court will therefore grant Great American's Rule 59(e) motion to amend the June 14, 1994 order to hold that Great American had a duty to indemnify Plaintiff *unless* Great American later prevails on the issue of a professional services malpractice exclusion.

Less clear is whether the parties raised and discussed the possible existence and applicability in Great American's OL & T policy of a non-insured premises exclusion. Great American does briefly refer to the possible existence of such an exclusion in its Memorandum in Support of Great American's Motion for Summary Judgment. Mem.Supp Great American's Mot.Summ.J. at 9 n. 5. One hesitates, however, to characterize this lone reference in a footnote, to which Plaintiff and the Does never responded and which Great American failed to raise anywhere else, as an "argument" that the Court "overlooked." *Anspach,* 817 F.Supp. at 1518; *Starr,* 767 F.Supp. at 635. The Court declines to grant Great American's Rule 59(e) motion on this ground, to the extent that

Great American raises it to contest its duty to indemnify.

Great American also argues, however, that it intends to raise this argument to contest the extent of its liability for breach of duty to indemnify. Great American's Consolidated Reply Mem. Servants' & Does' Mem.Opp. Great American's Mot. Alter Amend J. at 8–10. Briefly, it intends to argue that some portion of the Does' injuries arose from actions taken at uninsured Minnesota premises that Plaintiff controlled. Then, it will argue, a non-insured premises exclusion in its OL & T policy excludes Great American's liability for the portion of the Does' injuries that resulted from actions taken at these premises. Great American correctly observes that this argument may reduce the extent of its liability for breach of the duty to indemnify. The parties did not raise and need not have raised, and the Court did not address, the extent of Great American's liability for breach of its duty to indemnify. *See Servants,* 857 F.Supp. at 837. The Court will therefore clarify that in its June 14, 1994 order it did *not* decide the extent of Great American's liability for breach of its duty to indemnify, and that Great American may subsequently argue that a non-insured premises exclusion in the OL & T policy it issued to Plaintiff reduces its liability.

■ Conversely, the parties did not raise or discuss three of Great American's proposed coverage defenses. With respect to these defenses, the Court holds that Great American could and should have raised the defenses during the summary judgment process, and may not raise them now by way of a Rule 59(e) motion. *Steele,* 11 F.3d at 1520 n. 1. Initially, neither party refers to any papers before the Court prior to its June order in which Great American raised or discussed the defenses of untimely notice under the policy or nonfortuity. The same is also true of a third coverage defense, that Plaintiff settled the New Mexico Does' claims without Great American's consent in violation of the policy's noncooperation clause. Great American argues that this last defense goes to extent of liability, in that Great American may only raise the defense with respect to claims it actually defended, *i.e.,* the New

Mexico Does' claims. The Court disagrees. The defense of the insured's breach of a noncooperation clause goes to *whether* Great American has a duty to indemnify, not *to what extent* Great American is liable for breach of that duty. The fact that Great American can only raise this defense with regard to the New Mexico Does' claims, and so cannot thereby be completely relieved of liability, does not change the basic nature of the defense.

Finally, Great American wishes the Court to clarify that the Court has not yet decided the extent of Great American's liability for breach of its duty to indemnify, and that Great American may therefore still argue that its liability does not exceed the OL & T policy's limits and that Plaintiff's settlements with the Does were not reasonable and in good faith. As noted *supra,* the Court did not decide extent of liability issues in its June 14, 1994 order. The Court will therefore grant this portion of Great American's Rule 59(e) motion.

## XI. ST. PAUL'S MOTION TO RECONSIDER, CLARIFY AND/OR AMEND THE ORDER DENYING ITS MOTION FOR SUMMARY JUDGMENT

■ The Court will deny that portion of St. Paul's motion to reconsider, clarify, or amend the Court's June 14, 1994 order asking the Court to find that Plaintiff's evidence of St. Paul Policy No. 530JB0433 is legally insufficient. The Court has set out the reasons for this holding extensively in Section III of this Opinion. As it did in its June 14, 1994 order, the Court concludes that "Plaintiff has come forward with sufficient evidence to raise a genuine issue of material fact as to whether it· has shown the existence and terms of a St. Paul policy by a preponderance of the evidence." *Servants,* 857 F.Supp. at 829. However, St. Paul also takes issue with the Court's holding in the June order that "St. Paul had a duty to defend the Minnesota claims." According to St. Paul, the Court cannot find as a matter of law that St. Paul had a duty to defend when a material fact issue still exists regarding whether St. Paul ever issued the policy alleged to provide coverage. St. Paul is correct, and the Court

will therefore clarify its June order to hold that St. Paul had a duty to defend *provided* the trier of fact finds that St. Paul issued Policy No. 530JB0433 to Plaintiff.

The Court in its June order did not decide whether an insured must first establish the existence of the alleged policy before the Court may find that the insurer had a duty to defend the insured against an arguably covered claim. Rather, the Court, after finding that a genuine issue of material fact existed as to the existence and terms of the St. Paul policy, then considered whether the alleged St. Paul policy arguably covered the Does' claims. 857 F.Supp. at 830–31. The Court found that the alleged St. Paul policy did indeed provide arguable coverage of the Does' claims, and in summarizing this finding broadly stated that St. Paul had a duty to defend.

Few courts or commentators have addressed whether an insured must first establish the existence and terms of a policy before a court or trier of fact may find that the insurer had a duty to defend. Rather, most courts appear to assume without stating that the court must have and has ascertained the policy's existence and terms prior to finding a duty to defend. *See, e.g., Western Commerce Bank v. Reliance Ins. Co.,* 105 N.M. 346, 347, 732 P.2d 873, 874 (1987) ("Whether an insurer has a duty to defend a suit filed by a third party against the insured depends on whether the allegations of the petition are sufficient to state a claim within *the terms* of *the policy.*") (emphasis added). However, at least two courts have expressly stated that an insured must first establish the existence and terms of the policy before the insurer can be held to have had a duty to defend. *See Abex Corp. v. Maryland Cas. Co.,* 790 F.2d 119, 129 (D.C.Cir.1986) ("Before the District Court imposes any duty on [the insurer], it must first determine that [the insurer] insured Abex for the years claimed."); *Boyce Thompson Inst. for Plant Research, Inc. v. Insurance Co. of N. Am.,* 751 F.Supp. 1137, 1140 (S.D.N.Y.1990) ("Whether or not an insurer is obligated to undertake the defense of the insured is determined by engaging in a straightforward analysis. First, the insured must make a threshold showing that insurance policies exist that indeed provide such coverage.") [10] Two leading insurance law commentators agree with these cases. *See* 14, 19 Ronald A. Anderson & Mark S. Rhodes, Couch Cyclopedia of Ins. Law §§ 51:35, 79:44 (2d ed. 1982–83) ("A duty to defend is contractual and if there is no contract to defend there is no duty to defend.... The insured has the burden of showing the existence of a valid contract."); 7C John A. Appleman, Insurance Law & Prac. § 4682, p. 21 (Berdal ed. 1979) ("[T]here can be no ... duty [to defend] where the defendant is not an insured irrespective of allegations in the complaint.")

The Court has been cited to and has located no cases supporting Plaintiff's and the Does' argument that an insurer need only create a genuine fact issue as to the existence and terms of the policy before a court may hold that the insurer has a duty to defend. The Court will therefore grant that portion of St. Paul's motion to amend requesting the Court to find that St. Paul had a duty to defend *provided* the trier of fact finds that St. Paul did issue an OL & T policy numbered 530JB0433 to Plaintiff during the relevant period.

---

**10.** The Court notes that it has disapproved of the *Boyce* decision insofar as it held that an insured must prove the existence and terms of a lost policy by clear and convincing evidence, rather than by a preponderance of the evidence. *See Servants,* 857 F.Supp. at 828.